The TRUSTEES of the ASSOCIATE REFORMED CHURCH in Newburgh, and the TRUSTEES of the ASSOCIATE REFORMED CHURCH in Little Britain, v. The TRUSTEES of the THEOLOGICAL SEMINARY at Princeton.

The general synod of the Associate Reformed church have, by the constitution of the said church, no authority to do any act, or make any regulation, which interferes with the established order of the church.

The act of union between the general synod of the Associate Reformed church and the general assembly of the Presbyterian church, adopted on the twenty-first day of May, eighteen hundred and twenty-two, is invalid.

A transfer of the funds of the church, as a consequence of the said union, and necessarily connected therewith, is also invalid.

That portion of the Associate Reformed church which refused to acquiesce in the act of union, but maintained its separate and independent existence, retained all the rights and interest in the funds which the church possessed prior to the act of union.

Neither the donor of trust property, nor any other person into whose hands it may come, has a right to apply it to any other purpose than that for which it was originally intended.

It is a well established principle, that when part of any religious association separate and establish a new society, they cease to be members of the original society, and have no longer any claim to their property.

Where property has been given in trust for a church not incorporated, it is competent for any person belonging to that church, on behalf of himself and of all others belonging to that church and entitled to the use of the funds, to come into a court of equity to enforce the execution of the trust.

And if the church consists of various congregations, any one or more of such congregations, being incorporated, may in like manner enforce the execution of the trust.

THE bill is filed by the trustees of the Associate Reformed church, in Newburgh, and the trustees of the Associate Re-

7*

formed congregation in Little Britain, who sue as well for themselves as in behalf of all the other Associate Reformed churches and congregations in the state of New York, interested and connected in the matters therein mentioned and contained.

The bill states, that the complainants have been severally and respectively incorporated under and according to the provisions of an act of the legislature of the state of New York, entitled, " An act to provide for the incorporation of religious societies," by the corporate names and styles herein before mentioned, and now exist as religious incorporations in the state of New York, using and entitled to the privileges of taking into their possession and custody all the temporalities belonging to their churches, whether the same consist of personal or real estate, and whether the same shall have been given, granted or devised directly to their church, or to any other person for their use ; and of sueing or being sued by their corporate name or title, in all courts of law or equity, and of receiving, holding and enjoying, all the debts, demands, rights and privileges, and estates belonging to their churches in whatsoever manner the same may have been acquired, in whose name soever the same may be held ; and of purchasing and holding real and personal estate for the use of their churches or other pious uses, and other privileges and powers by the said act granted and conferred. That there are now in the state of New York, seventeen other Associate Reformed churches, also incorporated under and according to the provisions of the act herein before mentioned, associated with the complainants, professing the same articles of faith, the same church discipline and government, and governed by one and the same synod or church judicatory, called the Associate Reformed synod of the state of New York, and forming and comprising a distinct body or sect of christians, under the general denomination of the Associate Reformed church ; that the constitutional and established form of government of the Associate Reformed church is the presbyterial by several sorts of assemblies composed of pastors and other elders, which assemblies are congregational, classical and synodical, in a just subordination

[Associate Reformed Church v. Trustees of Theological Seminary.]

of the congregational assemblies to the classical, and of the classical assemblies to the synodical; that the congregational assemblies consist of the minister or ministers and elders of a particular congregation, and are called sessions; that the classical assemblies are composed of all the ministers within a certain district, each accompanied by a ruling elder, commissioned from the session, and are called presbyteries; that a synodical assembly consists of several presbyteries met together, and is called a synod. And it is provided by the constitution and articles for the government of said church, that when the multiplication of presbyteries and distances from each other render it impracticable to meet all in one synod, that they be divided into two or more synods, as circumstances may require; that in such case all the particular synods meet together by presbyterial delegation in one general synod; and it is further provided, that neither a particular synod nor such general synod, can do any act affecting the general interests of the church, without submitting the same to the presbyteries for their judgment therein. That in the year eighteen hundred and one, the Associate Reformed church, consisting of and comprising about thirty congregations, with settled ministers, was divided into seven presbyteries, viz. the presbytery of Washington and the presbytery of New York, in the state of New York; the first presbytery of Pennsylvania, the second presbytery of Pennsylvania, the first and second presbyteries of Carolinas and Georgia, and the presbytery of Kentucky; and the said presbyteries met together and formed one synod, called the Associate Reformed synod. That on or about the second day of June, in the year eighteen hundred and one, the said The Associate Reformed synod, agreed upon and adopted the following resolutions:

First, That a minister of this church be sent to Great Britain and Ireland, or either of them, to procure a competent number of evangelical ministers and probationers, and that his expenses be defrayed from the synodical fund.

Second, That he be authorized to procure a number of pious and intelligent students of divinity, who shall engage to repair,

after the completion of their studies, to the United States, and place themselves under the direction of this synod.

Third, That he be further authorized and enjoined to solicit donations in money, for the purpose of erecting and maintaining a theological seminary, for the education of youth for the holy ministry.

Fourth, That according as the moneys in his hands shall permit, he be also authorized to purchase a library for said seminary, and a collection of those books which are most needful and useful for this synod, to be distributed among their ministers and students as shall hereafter be directed; and that he solicit donations of books for both these purposes.

And in pursuance of said resolutions, chose and appointed the reverend John M. Mason for the said mission, and ordered and directed the payment of the expenses of the said John M. Mason; and also provided for the supplying of the congregations at New York, during the absence of their pastor, the said John M. Mason, at the expense of the said synod.

The bill further states, that in pursuance of the said resolutions and appointment, the said John M. Mason proceeded to Great Britain, in the year eighteen hundred and one, and received and collected, for the use of the theological seminary of the Associate Reformed church, the sum of five thousand one hundred and forty-six dollars and ninety-three cents; and also received donations of books valued at three hundred and fifty-six dollars and seventy-six cents. That of the money so collected and received, the sum of four thousand one hundred and thirty-four dollars was expended by the said John M. Mason, in the purchase of books for a library, for the said theological seminary, which were brought, together with the said books received in Great Britain, to the city of New York, in the year eighteen hundred and two.

That large collections in the several Associate Reformed churches of the United States, and large contributions and donations from individual members of said churches, were made and received for and appropriated to the endowment and estab-

[Associate Reformed Church v. Trustees of Theological Seminary.]

lishment of a theological seminary of the Associate Reformed church.

That soon after the return of the said John M. Mason from Great Britain, a theological seminary of the Associate Reformed church was established in the city of New York, which received and was endowed with the books herein before mentioned, and with the funds from time to time collected and contributed for its use, and large additions were, from time to time, made to the library of the said theological seminary; and the complainants state and charge that the several collections, contributions and donations before mentioned, were made from and by the members of the Associate Reformed church, a distinct and separate religious sect or denomination of christians, and were intended in all cases, by the donors, for the special and particular use of that particular church or denomination, and became and was the common property of the Associate Reformed church.

That in the year eighteen hundred and two, the said Associate Reformed synod, with the assent and concurrence of the presbyteries, was, by the resolutions and determination of the said synod, divided into four particular synods, and a general synod constituted and appointed, agreeably to the constitution and articles of the church, according to the following plan:

First, That the presbyteries of New York and Washington be constituted into one synod, to be called the synod of New York.

Second, That the first presbytery of Pennsylvania be divided into two presbyteries, to be called the presbytery of Philadelphia and the presbytery of Big Spring; and that these presbyteries constitute one synod, to be called the synod of Pennsylvania.

Third, That the second presbytery of Pennsylvania be hereafter called the presbytery of Monongahela, and together with the presbytery of Kentucky, constitute one synod, to be called the synod of Scioto.

Fourth, That the first and second presbyteries of the Caro-

linas and Georgia constitute one synod, to be called the synod of the Carolinas.

Fifth, That the aforesaid arrangements take place from and after the adjournment of the present meeting of the synod, and that the general synod hold their first meeting at Greencastle, on the last Wednesday of May, in the year eighteen hundred and four. That the said meeting was accordingly held, and that the general synod continued to meet annually, on their own adjournments, until the year eighteen hundred and twenty-two.

That in the year eighteen hundred and twenty, the synod of Scioto separated and withdrew from the jurisdiction of the general synod, without the consent of the general synod; and that in the year eighteen hundred and twenty-one, the synod of the Carolinas was separated from the said general synod, and constituted an independent synod, with the consent of the said general synod.

The bill further states, that by the common consent of the church, the supreme judicatory of the Associate Reformed church acted as trustees for the church, and possessed and exercised a general superintendence and control over the property and funds of the church and of the seminary, until the year eighteen hundred and twenty-two; and that under their direction the books and library of the seminary were in the immediate custody and possession of John M. Mason, until the removal of the said John M. Mason from the city of New York, and after his removal they were in the immediate custody of some person or persons connected at that time with the Associate Reformed church, but whose names are unknown to the complainants; but the complainants state the fact to be, that they were kept in New York, in the custody of the said John M. Mason, and of the person or persons who succeeded him as the agents of the said Associate Reformed church, or officers of the theological seminary of the Associate Reformed church.

That in the year eighteen hundred and twenty-one, a proposal was made by the general assembly of the Presbyterian church, to the general synod of the Associate Reformed church,

[Associate Reformed Church v. Trustees of Theological Seminary.]

to unite the churches, on the basis and articles of union herein-after set forth; and that said proposal and articles of union were by the resolution of the said general synod, in pursuance of the constitution of the Associate Reformed church, referred to the consideration of the different presbyteries of the Associate Reformed church, with an injunction to the said presbyteries to report their judgment thereon, to the said general synod, at their next meeting.

That at the next meeting of the general synod, in the year eighteen hundred and twenty-two, three presbyteries out of the five represented in the said general synod, reported their dissent and judgment against the proposal and articles of union; that the presbyteries opposed to the union, were not fully represented in said general synod; that the general synod proceeded to the consideration and decision of the question of the union, and that the articles of union hereinafter set forth, were adopted by a majority of one vote of the delegates who voted on the question, but by a minority of the delegates present.

That the articles of union adopted by the said general synod in manner aforesaid, were as follows:

First, The different presbyteries of the Associate Reformed church shall either retain their separate organization, or shall be amalgamated with those of the general assembly, at their own choice; in the former case, they shall have as full powers and privileges as any other presbytery in the united body, and shall attach themselves to the synods most convenient.

Second, The theological seminary at Princeton, under the care of the general assembly, and the theological seminary of the Associate Reformed church, shall be consolidated.

Third, Whereas, moneys to the amount of between nine and ten thousand dollars, which were given to the general synod of the Associate Reformed church, and of which the interest or product only, was to be applied to the support of a theological seminary, were necessarily used in the current expenses thereof, which moneys so expended, were assumed by the synod as its own debt, at an interest of seven per cent; the united body agree to make a

joint effort to repay the same, and will apply the interest accruing thereon, to the maintenance of a professorship of biblical literature in the seminary at Princeton, analogous to that which now exists in the Associate Reformed church; and until such professorship shall be established, the said interest or product shall be used for the general purposes of the seminary.

Fourth, The theological library and funds belonging to the Associate Reformed church, shall be transferred and belong to the seminary at Princeton.

That the Reverend Mr. Smith, in behalf of himself, and Messrs. Otterson, Forrest, McCullough and Lefferts, by the permission of the said general synod, entered the following protest upon the minutes thereof:

Whereas, the plan of union agreed upon by the committees appointed by the general assembly of the Presbyterian church, and the general synod of the Associate Reformed church, referred by the latter, in May, eighteen hundred and twenty-one, to their respective presbyteries, was at their meeting on May, twenty-first, eighteen hundred and twenty-two, adopted by the general synod of the Associate Reformed church; now, therefore, the undersigned, for the glory of God, in maintaining the purity of the discipline, worship, doctrine and government of his house; for the preservation of their own characters, and for the exoneration of their own consciences, hereby do, in the name of the Lord Jesus Christ, most solemnly and deliberately, protest against the said resolution, for the following reasons, to wit:

Because, the expression of the sentiments with regard to the union, both by the congregations and presbyteries, a large majority of the former and a majority of the latter being decidedly opposed to it, was entirely disregarded in the determination.

Because, the adoption of said plan, instead of being an expression of the sentiments of the Associate Reformed church, was effected by the delegates from the presbytery of Philadelphia alone, only one member from the remaining four presbyteries voting in its favor.

[Associate Reformed Church v. Trustees of Theological Seminary.]

Because, there is no likelihood, from the diversity of senti-ment that exists between the protesters and members of the general assembly, respecting many of the doctrines of the gos-pel as well as the government of the church, and many other things permitted by them, in direct opposition to the standards of their church, that the union could be accomplished with those feelings of reciprocity that ought to characterize christian churches in forming so close and intimate a connection.

The bill further states, that immediately after the adoption of the resolutions and articles of union, in manner before mentioned, the library and books herein before mentioned, and the funds of the Associate Reformed church, and of the theolo-gical seminary of the Associate Reformed church, were all transferred, delivered, and paid over to the theological seminary at Princeton, and have ever since been possessed, used and en-joyed by the said theological seminary at Princeton.

The complainants respectfully charge and submit that the act and vote of union with the Presbyterian church, by the general synod of the Associate Reformed church, was void and of no effect, being contrary to the constitution and established articles of government of the said church, in opposition to the vote and judgment of a majority of the presbyteries of said church duly and solemnly given and expressed, and also con-trary to the wishes of a large majority of the congregations and members of the said Associate Reformed church; and that the granting, ceding and delivery of the library and funds afore-said, was unlawful and void, not only for the causes next herein before mentioned, but also because the said general sy-nod were merely the trustees of the Associate Reformed church, entrusted with the said library and funds only for the special uses and purposes for which the same were collected and in-tended by the donors, and had no authority to give, cede or dispose of the same, either to the theological seminary of an-other church, or to any other person or persons whatsoever.

That a large majority of the Associate Reformed churches in the state of New York, refused to concur in the said union,

but continued and still continue in the same established form and order of the Associate Reformed church and church government, maintaining the uninterrupted and unchanged existence of the separate and distinct church or denomination called and known as the Associate Reformed church; and the complainants respectfully submit, that the separation of some portion of the congregations and members of the Associate Reformed church, from the said church, and their union and junction with the Presbyterian church, though it diminished the numbers and strength, had no effect whatever to take away or destroy the existence or continuance, or in any manner impair the rights, of the said Associate Reformed church.

That the Associate Reformed church has increased in ministers and members since the year eighteen hundred and twenty-two, and now comprises more than thirty congregations, under the care of four presbyteries, viz. the presbyteries of New York, Saratoga, Washington and Caledonia, all under the superintendence and government of the synod of New York, and being and continuing the Associate Reformed church, in the same form and in all essential respects, as it was in the years eighteen hundred one and two, when the books, library and funds aforesaid were principally acquired.

That the Associate Reformed church have now a theological seminary established at Newburgh, in the state of New York, in direct connection with the Associate Reformed church, and is maintained by the said church, and devoted to the education of students of divinity designed for the ministry in said church.

That the cession of the said library and funds, was and is wholly unauthorized and void, and transferred no property therein to the theological seminary at Princeton, or to the trustees thereof; and the complainants and those in whose behalf they claim, being the Associate Reformed church, are owners thereof, and of right entitled to the property therein, and to the possession thereof.

That at the same time, with the said library and funds, or money, all the accounts, records, books, vouchers and catalogues

appertaining or relating to the same, were also transferred and delivered over to the said theological seminary at Princeton, or to the trustees, so that the complainants, or those in whose behalf they claim, are unable to state or set forth particularly and with certainty the titles or numbers of books composing the said library, or the value thereof, or the amount of the said funds, but from information and belief, that the books composing said library were then of the value of about nine thousand dollars, and the said funds were of the amount of about two thousand dollars.

That ever since the said transfer, the said theological seminary at Princeton have had, and still have, the possession and use of the said library and funds under the care, charge and control of the trustees of the said theological seminary.

The prayer of the bill is, that the said, the trustees of the theological seminary at Princeton, may be decreed and directed to deliver over to the complainants the said library and funds, and to pay to the complainants all the interest accruing on said funds since they received the same, together with a reasonable compensation for the use of said library ; and may also be decreed to deliver over to the complainants all the account books, vouchers, catalogues and documents appertaining to said library and funds ; and that the complainants may have such other and further relief in all and singular the premises, as the nature and circumstances of the case may require, and to the court shall seem most meet.

The defendants, by their answer, admit the material charges in the bill touching the organization of the Associate Reformed church, the collection and appropriation of the funds, the adoption of the act of union, and the transfer of the library and funds in pursuance thereof; but they insist that the act of union was made by the supreme judicatory of the Associate Reformed church, upon a matter within its cognizance and control, and that the said act was constitutional and valid. That if the said act of union was, as is alleged in the bill of complaint, in oppo-

sition to the vote and judgment of a majority of the presbyteries of the the said Associate Reformed church, (which the defendants do not admit,) that the validity of the said act of union, and the transfer of the library and funds in pursuance thereof, was not thereby affected or in any wise impaired, inasmuch as by the constitution of the said church, it is the province of the general synod not only to decide questions respecting doctrine and discipline, but also in general to preside over the religious interests of the church at large, and to establish such regulations relative thereto as to them shall seem meet; that the power of the presbyteries, under the said constitution, touching such universal and permanent regulations as may be made by the said synod, is advisory merely; and that the action of the synod is by the constitution of the church binding and operative, whether the inferior judicatories concur therein or not.

The defendants further in answering say, that soon after the formation of the said union, and in pursuance of the first article thereof, a large number of congregations forming a part of the Associate Reformed church, and under the care of the general synod at the time of the union, became united with the Presbyterian church, and still continue in union therewith; and they insist, that inasmuch as the said congregations acted under the direction and in accordance with the decision and decree of the supreme judicatory of the Associate Reformed church, of which they then formed a constituent part, they are not separated from the said church, nor have they forfeited any of their rights, privileges or immunities as members of the said church, nor have they in any wise seceded therefrom, but that they are in fact still members of the said church, now united under the said articles of union with the Presbyterian church, and that they are entitled to all the rights, privileges and immunities to which they were entitled as members of the Associate Reformed church at the time of the said union, and the more especially, as the said Associate Reformed and Presbyterian churches are one in doctrine, discipline and form of government.

They further say, that in pursuance of the articles of union,

the theological seminary of the Associate Reformed church and the theological seminary at Princeton under the care of the general assembly of the Presbyterian church, were consolidated, and so continue ; that the said library and funds were transferred to and held by the defendants, in trust, and for the benefit of the said seminary ; and they insist that the general synod of the Associate Reformed church had full power and authority to make the said transfer for the purpose aforesaid, and that the trust fund is not diverted from the purpose for which it was intended by the donors.

They further insist, that the synod of New-York is not identical with the general synod of the associate Reformed church, nor is the synod of New-York invested with the powers, duties and titles to property of the said general synod, nor are they entitled to the possession of the library and funds in the hands of the defendants, even if the act of union and the transfer of the said library and funds in pursuance thereof, are null and void.

The cause was heard upon bill, answer, replication and proofs.*

*Frelinghuysen* and *I. H. Williamson*, for complainants.

*Southard* and *H. W. Green*, for defendants.

Cases cited by complainants' counsel. *Prec. in Chan.* 592 ; 3 *Vesey*, 70 ; 6 *Vesey*, 773 ; 16 *Vesey*, 321 ; 3 *Mer.* 351 ; 2 *Kent*, 287 ; 1 *Sch. and Lef.* 261 ; 11 *Vesey*, 428 ; *Cooper's Eq. Pl.* 39, 41 ; 2 *Sim. and S.* 267 ; 2 *Peters*, 579 ; 3 *Burr.* 1871 ; 1 *Dess.* 154 ; 2 *Paige*, 43 ; 3 *Mer.* 417 ; 9 *Wend.* 394 ;

---

* The cause was originally argued before chancellor Vroom, at July term, 1836. At October term he directed a re-argument, mainly, as it was understood, upon the question whether, supposing the act of union to be invalid, the complainants were entitled to the possession or benefit of the trust property. The cause was again argued before chancellor Dickerson, at a special term, in March, 1837.

8*

[Associate Reformed Church v. Trustees of Theological Seminary.]

2 *Kent's Com.* 279 ; 2 *Atkyns,* 405 ; 16 *Mass.* 488 ; 4 *Mass.* 389 ; 2 *Wend.* 109.

Cases cited by defendants' counsel. 3 *Peters,* 100, 114 ; 4 *Wheaton,* 1 ; 1 *Bos. and Pull.* 43 ; 2 *Kent's Com.* 287 ; 3 *Dess.* 582 ; 3 *Vesey and B.* 180 ; 2 *Mad.* 181 ; 1 *Tamlyn,* 14 ; 5 *Con. Eng. Chan.* 260 ; 1 *Turn. and Russ.* 270.

The Chancellor. The complainants in this suit are duly incorporated, under an act of the legislature of the state of New-York, entitled, "An act to provide for the incorporation of religious societies." And there are seventeen other Associate Reformed churches in the state of New-York, incorporated under the same act, associated with the complainants, professing the same articles of faith, the same church discipline, and governed by one and the same synod, or church judicatory, called "The Associate Reformed synod of New-York," and forming a distinct body of christians, under the general denomination of "The Associate Reformed church." And their established form of government is presbyterial, having sessions, presbyteries and synods.

In the year eighteen hundred and one, they had thirty congregations, with settled ministers, divided into seven presbyteries, viz. : The presbytery of Washington and of New-York, in the state of New-York ; the first and second of Pennsylvania ; the first and second of Carolinas and Georgia, and one of Kentucky ; and those presbyteries met and formed a synod, called "The Associate Reformed synod."

On or about the second of June, A. D. eighteen hundred and one, and before any of these churches were incorporated, this synod resolved to send the Rev. John M. Mason to Europe, "to solicit donations in money for the purpose of erecting and maintaining a theological seminary for the education of youth for the holy ministry," and "to purchase a library for said seminary, and a collection of those books which are most needful and use-

ful for this synod, to be distributed among their members and students," &c.

Under this resolution, the said John M. Mason proceeded to Great Britain and collected some moneys and a library, with which he returned to the city of New York in eighteen hundred and two.

Large collections were also made in this country and appropriated to the endowment and establishment of a theological seminary of this church, which was established in the city of New York, and endowed with those books and funds, and with other funds received from time to time.

In eighteen hundred and two, this Associate Reformed synod was divided into four particular synods, and a general synod was at the same time formed, to hold its first meeting at Greencastle, on the last Wednesday of May, eighteen hundred and four.

This general synod met annually, and the church continued under this organization until eighteen hundred and twenty-two, during all which time this library and the funds of the church, were in the custody of the general synod, who by the consent of the church, exercised a general superintendence over their property and funds.

In eighteen hundred and twenty-two, the general synod formed an union with the general assembly of the Presbyterian church, by the following articles of agreement.

1. "The different presbyteries of the Associate Reformed church, shall either retain their separate organization, or shall be amalgamated with those of the general assembly, at their own choice. In the former case they shall have as full powers and privileges as any other presbytery in the united body, and shall attach themselves to the synods most convenient."

2. "The theological seminary at Princeton, under the care of the general assembly, and the theological seminary of the Associate Reformed church, shall be consolidated."

3. "Whereas moneys to the amount of between nine and ten thousand dollars, which were given to the general synod of the

Associate Reformed church, and of which the interest or product only was to be applied to the support of a theological seminary, was necessarily used in the current expenses thereof, which moneys so expended were assumed by the synod as its own debt at an interest of seven per centum; the united body agree to make a joint effort to re-pay the same, and will apply the interest accruing thereon, to the maintainance of a professorship of biblical literature in the seminary at Princeton, analagous to that which now exists in the Associate Reformed church, and until such professorship shall be established, the said interest or product shall be used for the general purposes of the seminary."

4. "The theological library and funds belonging to the Associate Reformed church, shall be transferred, and belong to the seminary at Princeton."

Immediately after this union the library and funds of the Associate Reformed church, and of their seminary, were transferred, and delivered over to the theological seminary at Princeton, where they have since remained.

The bill in this case is filed to recover the possession of said library and funds, and a compensation for the use of the library and interest on the funds. Such is the general state of the facts, apparent from the pleadings and evidence in the case. And although it is deeply to be regretted that causes of this kind should arise, yet the manner in which this has been conducted, shows clearly that the parties seek only for truth and justice, and it furnishes striking evidence that the lines which mark the rights of property may be so indistinct, that men of the purest morals and most enlightened judgments, may honestly differ as to their true position.

In the investigation of this subject, it is necessary to inquire,

1. Whether the Associate Reformed church, for whose use these books and funds were given, still exists?

2. Whether they are still entitled to the use and enjoyment of those books and funds as they were before the union? and,

3. Whether these complainants have made a proper case for the interference of this court, and whether they are the proper parties in court?

As to the first point, I think no serious doubt can exist. The answer upon this subject admits "that several of the Associate Reformed churches, under the care and supervision of the general synod of the Associate Reformed church at the time of the aforesaid union, refused to concur therein, but continued, and still continue separate and distinct from the Presbyterian church, retaining the name of the Associate Reformed church. That certain of the said churches have united under the same church discipline and government, and are governed by one and the same synod or church judicatory, called the Associate Reformed synod of the state of New-York." And in addition to this admission, all the witnesses speak of "the Associate Reformed church" as an existing church.

The next inquiry is, whether they are still entitled to the use and enjoyment of these books and funds as they were before the union? and this involves the important question as to the power or authority of the general synod to form this union.

The Associate Reformed church has existed in this country for many years, as a separate or distinct branch of the christian church.

In the year seventeen hundred and ninety-six it was composed of several presbyteries, and one synod, called "the Associate Reformed synod," which consisted of those presbyteries met together for mutual assistance, and for managing the affairs of the church under its care.

This form of government by presbyteries and one synod, continued until eighteen hundred and two, during all which time this associate synod was the supreme head of the church, as to its government and order. In eighteen hundred and two, the synod, by the assent of the presbyteries, resolved to divide itself into four particular synods, and to form a general synod, which held its first meeting at Greencastle, in Pennsylvania, on the last Wednesday of May, eighteen hundred and four.

This general synod was composed of delegates from the several presbyteries, with powers expressly defined in their constitution; and to that definition of their powers I refer, to ascertain

their extent, with this remark, that their powers were delegated and not inherent.

By the seventh section of the sixth chapter of their church government, it is declared that "the general synod thus constituted, is in every respect to the particular synods, what the latter are to the presbyteries within their bounds. It is also the province of the general synod to decide questions respecting doctrine and discipline, to bear testimony against errors and immoralities, to correspond with other churches, and in general to preside over the religious interest of the church at large. But no regulation intended to be universal and permanent, shall be established without previously transmitting them to the several presbyteries, that they may have time to consider and report their judgment thereon."

As this definition of the powers of the general synod refers to the power of the particular synods over the presbyteries within their bounds, it becomes necessary to inquire as to that power.

By the second section of the same chapter, after reciting a variety of specific powers, it is declared that they have power "generally to make such regulations, with respect to presbyteries, sessions, and people under their care, as do not interfere with the established order of the church."

It is, therefore, evident that the particular synod can do no act that shall "interfere with the established order of the church;" and as the general synod is in every respect, to the particular synods, what the latter are to the presbyteries within their bounds, I conclude that their powers are not more extensive than those of the particular synod; unless upon a fair construction of some other part of the seventh section above quoted, that further powers can be inferred. These further powers are "to decide questions of doctrine and discipline, to bear testimony against errors and immoralities, to correspond with other churches, and in general to preside over the religious interests of the church at large." Here is no authority given to interfere with the established order of the church. And as to the last clause of said article respecting the establishment of regulations, which are intended

to be universal and permanent, I consider that as a limitation, rather than a grant of power.

From these premises, I conclude that the general synod had no authority to do any act, or make any regulation which should interfere with the established order of the church.

In order to apply this principle to the articles of union, it is necessary to examine those articles, and see if they do in fact interfere with the established order of the church. And in order to understand their true bearing, they are to be considered as valid, and of course obligatory upon the several presbyteries composing the general synod ; and in that view, let us inquire what would have been their effect.

By the second article, the two seminaries are consolidated, and of course one of them ceased to exist.

By the fourth article, the theological library and funds belonging to the Associate Reformed church, are transferred, and belong to the seminary at Princeton, and consequently, it is the seminary of the Associate Reformed church that ceased to exist.

By the third article, it appears that the general synod of the Associate Reformed church had become indebted to their church in the sum of nine or ten thousand dollars, and by that article it is provided, " that the united body agree to make a joint effort to repay the same." Here we find that the two churches are united and form but one body or church, and of course one of the churches must have ceased to exist, and the question is, which church survived ?

We have already seen, by the fourth article, that the theological library and funds of the Associate Reformed church, are transferred, and belong to the seminary at Princeton ; and by the second article, that the theological seminary of the Associate Reformed church had ceased to exist, and therefore, it cannot be presumed, that the Associate Reformed church survived, having already given away her library and funds.

But this view of the case is confirmed by the first section, which provides " that the different presbyteries of the Associate

Reformed church, shall be amalgamated with those of the general assembly ; or if they choose, they shall retain their separate organization, in which case, they shall have as full powers and privileges as any other presbytery in the united ody, and shall attach themselves to the synods most convenient ;" thus giving to a presbytery of the Associate Reformed church, the privilege of being attached to the most convenient Presbyterian synod, and to the general assembly.

Upon a fair construction of these articles of union, it is manifest that the Presbyterian church was the body that was to survive ; and this was evidently the view taken of it by those who formed the union, for by reference to the minutes of their proceedings in May, eighteen hundred and twenty-two, after the adoption of the articles of union, I find that the general assembly of the Presbyterian church, invite all the delegates at the synod, to take their seats, as members of the general assembly, which is accepted ; and it is resolved by the general synod of the Associate Reformed church, " that all the minutes and documents, together with a complete series of the published extracts belonging to the general synod, be, and they are thereby directed to be, by the clerk deposited with the session of the congregation of Spruce street church, subject to the future disposal of the general assembly of the Presbyterian church."

It was the obvious intention of those who formed the union, and it is evident from the articles of union themselves, and the proceedings had thereon, that the Associate Reformed church should be merged in the Presbyterian church, to all intents and purposes ; and such has been the fact, with regard to those who came in under the union ; and such would have been the effect, as to the whole church, if those articles of union had been considered by all as obligatory. By this act they not only interfere with the established order of the church, but actually destroy the church of which they are the highest judicatory.

It has not been contended, nor do I think that it can be, that the power of the general synod of the Associate Reformed church had this extent. Chancellor Dessasure very justly re-

marks, "that one of the fundamental rules of incorporate bodies is, that the members are not to do any act which may destroy its existence, or injure its privileges." And the reason of the rule applies with equal force to voluntary associations.

I therefore conclude, that the union is invalid, and that the Associate Reformed church still have the same rights and interest in these books and funds, that they had before the adoption of these articles of union.

But it was contended, that the general synod had a right to transfer this library and these funds to the seminary at Princeton, although they might not have had the right to form the union.

I do not think it necessary here to inquire, how far they had the power to dispose of this property ; for I consider this transfer of the books and papers, as a consequence of the union, and necessarily connected with it, in all its parts ; they must stand or fall together. It cannot be supposed, that they intended to transfer this property as a distinct act, to be considered as valid, although the other parts of the agreement were void.

It only remains to inquire, whether the case presented, be a case proper for the interference of a court of equity ; and whether these complainants are the proper parties to ask its aid.

The property in dispute, was originally given for the benefit of the Associate Reformed church, and held in trust for the purpose of erecting and maintaining a theological seminary for the education of youth for the holy ministry ; and also for a library for the use of the seminary. By the third section of the original resolution, under which Dr. Mason was appointed, he was authorized and enjoined to solicit donations in money, for the purpose of " erecting and maintaining a theological seminary, for the education of youth for the holy ministry." And by the fourth section, he was "authorized to purchase a library for said seminary, and a collection of those books which are most needful and useful for this synod, to be distributed among their ministers and students, as shall be directed," &c.

Under these resolutions, Dr. Mason obtained these donations,

9

and in his report, dated October twenty-sixth, eighteen hundred and two, after stating the amount of moneys received, he remarks, " of the money, the principal part has been expended in the purchase of books, most of which are to be deposited in the library of the seminary; the rest may be disposed of by sale, as the synod shall direct, but cannot be given away, unless their price be replaced, as the whole of the pecuniary donations were made to the seminary exclusively."

And the synod themselves, when applied to by the Lexington academy, for part of these books, resolve, " that they cannot, consistently with good faith, divide the moneys contributed expressly to the seminary they have now instituted nor the library purchased with part of those moneys."

It is, therefore, manifest that this property was trust property, and that neither Dr. Mason, nor any other person into whose hands it might come, had a right to apply it to any other purpose than that for which it was originally intended; and it is the duty of this court, upon a proper application, to see that this trust is not abused.

Let us, then, inquire if these complainants are the proper parties to ask relief in this case. At the time of the acquisition of this property, the Associate Reformed church existed under the same organization that it now exists; but since that time, various parts have separated from the original church, and thereby lost all right and title which they had to this property; for it is a well settled principle, that when part of any religious association separate and establish a new society, they cease to be members of the original society, and have no longer any claim to their property. In eighteen hundred and twenty, the synod of Scioto separated from the original church, and the congregations of the presbytery of Big Spring, which were opposed to the union, afterwards attached themselves to that synod. In eighteen hundred and twenty-one, the synod of the Carolinas separated, and by the union a large portion of the church united themselves with the Presbyterian church; but a great majority of the churches in the state of New York, refused to concur in the

[Associate Reformed Church v. Trustees of Theological Seminary.]

union, and they now consist of more than thirty congregations, under the government of the synod of New York, retaining their separate existence, in the established form and order of the Associate Reformed church; they have a theological seminary established at Newburgh, in connection with and maintained by the church, and this is the identical church for whose use this property was originally given. Who, then, should appear and claim the aid of this court, to restore this property to the use for which the donors intended it?

The general synod is not incorporated, and therefore, cannot act as trustees for this purpose. But the complainants are incorporated, and may be trustees and hold this property for the use of the church, provided the act by which they were incorporated gives them such authority. By the bill it appears, and it is admitted by the answer, that they are entitled "to the privileges of taking into their possession and custody, all the temporalities belonging to their churches, whether the same consist of personal or real estate; and whether the same shall have been given, granted, or devised, directly to their church, or to any other person for their use; and of sueing or being sued, by their corporate name or title, in all courts of law or equity; and of recovering, holding, and enjoying all the debts, demands, rights and privileges, and estates, belonging to their churches, in whatsoever name the same may have been acquired," &c.

The bill also charges, and it is admitted in the answer, "that there now are in the state of New York, seventeen other Associate Reformed churches, also incorporated under, and according to the provisions of the said act, associated with the complainants, professing the same articles of faith, the same church discipline and government, and governed by one and the same synod or church judicatory, called the Associate Reformed synod of New York, and forming and comprising a distinct body or sect of christians, under the general denomination of "the Associate Reformed church."

If these different congregations, forming the Associate Reformed church, had not become incorporated, it would have been

competent for any person-belonging to that church, on behalf of himself and all others belonging to that church, and entitled to the use of those books and funds, to have enforced the execution of that trust in this court.

In the case of *Chancy* v. *May, Prec. in Chan.* 592, the court sustained a bill filed by the treasurer and manager of certain brass works, on behalf of themselves and all other proprietors and owners, against the late treasurer and manager, to call them to account for the misapplication of funds.

The case of *Fells* v. *Read*, 3 *Ves.* 69, establishes the same doctrine.

And in the case of *Beatty and Ritchie* v. *Kurtz and others*, 2 *Peters*, 566, 579, the bill was filed by the complainants, alleging themselves to be trustees and agents for the German Lutheran church, on behalf of themselves and the members of the said church; and it was sustained, although the church had never been incorporated.

If, then, it would have been competent for the members, individually, to have enforced the execution of this trust, for the benefit of the whole, I can imagine no good reason why they should not be authorized to form themselves into corporations, for the purpose of more conveniently asserting and enforcing those rights which they had, and could assert in their individual capacity.

In the case of the *Presbyterian church of Bethel* v. *the Executors of Dounom*, 1 *Eq. R.* 154, "the funds were collected by voluntary subscription, to uphold a church and parsonage, for the use of the congregation and ministers, near Poupon river." This church was not incorporated at the time; James Dounom, the surviving trustee, who had possession of the property for a long time, attempted, by his will, to divide it, and to divert a part of it for the use of another church. The complainants afterwards became incorporated, and filed their bill against the executors of Dounom, for an account of the property, and the court were of opinion "that Dounom had no right to divert the funds of the society to different purposes than what

they were originally intended for;" and they decreed "that the funds should be assigned over to the complainants, for the benefit of the Bethel church."

And in the case of the *Canajoharie church* v. *Leiber*, 2 *Paige*, 43, the complainants and others, associated for the purpose of building a church, and the defendant agreed to give a lot for the purpose; voluntary subscriptions were raised, and a church built on the premises. Afterwards, the associates were incorporated, and filed the bill in their corporate name; and the chancellor remarked, "that although the agreement to convey this lot was made before the society was incorporated, yet in equity the agreement ought to be carried into effect with the incorporation, which now represents the rights of the original associates."

These authorities confirm the view which I have taken of the case, and satisfy me that these complainants are the proper parties in court; and that they are authorized to receive these books and funds, and to hold them in trust for the use of the church, according to the intention of the donors.

Decree accordingly.